**Opinion issued February 21, 2025.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-24-00648-CV**

————————————

**IN THE INTEREST OF A. B. G., A CHILD**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-00518J**

---

**MEMORANDUM OPINION**

J.B.V. ("Father") challenges the trial court's final decree terminating his parental rights to his minor daughter A.B.G. ("Amy") based on the court's findings that Father committed the predicate acts under Texas Family Code Sections 161.001(b)(1)(D), (E), (F), (N), and (O), and that termination of his rights was in

Amy's best interest.[1]  Father argues there is legally and factually insufficient evidence supporting the trial court's findings that (1) he committed the predicate acts under Sections 161.001(b)(1)(D), (E), (F), (N), and (O), and (2) termination of his parental rights was in Amy's best interest.

We affirm the decree of termination.

### Background

On March 23, 2022, the Texas Department of Family and Protective Services ("Department") received referrals concerning the sexual abuse of five-year-old Amy and neglectful supervision of Amy by her mother, M.G.R. ("Mother").[2]  On that day, a man believed to be Amy's father took Amy to the emergency room where she presented with fever, vomiting, a headache, and vaginal discharge.  Further testing indicated Amy had been sexually abused and revealed she had herpes simplex type 2.  Amy was admitted to the hospital where she remained for five days.  A Department investigator visited Amy in the hospital and separately spoke to Amy's babysitter and alleged father, J.M.P. ("Jim").  The Department was not able to reach Mother or Amy's biological father, the appellant in this case.

---

[1]  To protect the identity of the minor child, we refer to her by pseudonym and we refer to her biological parents as Mother and Father.  *See* TEX. R. APP. P. 9.8(b)(2).

[2]  For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

Over the next few days, Jim stopped responding to the Department's calls and the Department was unable to find Jim or Mother at the family's residence. During the five days Amy was in the hospital, she had no visitors or calls from family, and the hospital had not been able to get in contact with any parents, caregivers, or family members. Amy was ready to be discharged on March 28, 2022. The Department, however, was unable to locate any parent at that time, and Jim had provided no possible relative placements. Consequently, the following day, on March 29, 2022, the Department filed a petition seeking managing conservatorship over Amy and termination of Father's and Mother's parental rights to Amy. The Department also requested temporary managing conservatorship over Amy on an emergency basis.

In the removal affidavit attached to the Department's petition, Department caseworker Karla Rodas stated that the Department was requesting temporary managing conservatorship of Amy because the Sexual Assault Nurse Examiner ("SANE") evaluation conducted while Amy was hospitalized revealed that Amy had vaginal and anal tearing indicative of sexual abuse, and she had tested positive for herpes simplex type 2. According to Rodas, Jim[3] had left Amy and her 23-month-old brother J.A.P.G. ("John") with a babysitter on March 1, 13, 14 and 23, 2022.[4]

---

[3] The Department initially petitioned to terminate Jim's parental rights to Amy, but Jim was nonsuited from the case after Father submitted to a paternity test and the trial court found that he was Amy's biological father.

[4] John was also removed from Mother's care. Jim is John's biological father. The Department filed a petition in a related case to terminate Mother's and Jim's parental

Amy appeared healthy when she left the babysitter's home on March 14, 2022. But on March 23, 2022, when she returned, Amy complained of a headache and stated that her vaginal area was hurting. The babysitter became concerned when she gave Amy a shower and noticed "a slimy yellowish discharge" coming from Amy's vaginal area. Eventually, after multiple unsuccessful attempts, the babysitter was able to contact Jim, who picked up Amy and took her to the emergency room at Memorial Hermann Southwest Hospital.

The medical team treating Amy at Memorial Hermann Southwest notified the Department after they noticed Amy had "vaginal bruising and discharge," which is indicative of sexual abuse. On March 24, 2022, Amy was transferred for a SANE evaluation to Children's Memorial Hermann Hospital. Although Jim stayed with Amy while she was at Memorial Hermann Southwest, Jim left for work on March 24, 2022, and never returned to the hospital.

Amy was admitted to Children's Memorial Hermann Hospital on March 25, 2022, and discharged into foster care on March 30, 2022. Her medical records reflect that during her five-day hospitalization from March 25 through March 30, 2022, she had no "visitors or calls from family," she had "no caretaker at bedside," and the hospital had been unable to contact her parents, caregivers, or family members.

rights to John, and Amy's and John's cases were tried together. Neither Mother nor Jim appealed from the termination of their parental rights to John.

According to her records, Amy appeared to be developmentally delayed and was "mostly nonverbal." She was unable to state her name, state her birthday, count to ten, or recite the alphabet. Amy was later diagnosed with developmental and speech delays, and assessments recommended speech and occupational therapy.

With respect to Mother, Rodas' affidavit stated that Mother "disappears for periods of time to use drugs" and "takes the children with her when using drugs." According to Rodas, Jim told the Department that Mother "uses crack," has a "crack addiction," and spends time with drug users, but he allows Mother to watch the children unsupervised when she appears to be clean. He also disclosed that he had come home several times to find a random man in his home, along with Amy and John. Jim told the Department, who was still trying to locate Mother, that Mother "hangs with drug users around the Bayou" and the Department might be able to find Mother "sleeping under a bridge." Additionally, a neighbor told Rodas he had seen Mother using drugs "by a canteen around Braeswood and Gessner." The Department asked Jim for the names of relatives who might provide a placement for Amy, but Jim failed to provide the Department with contact information for any family members. Jim later stopped responding to the Department's calls and the Department was unable to contact him or find him or Mother at the family's residence while Amy was in the hospital or upon her discharge.

While Amy was still in the hospital, the Department discovered that Father had filed a Medicaid application for Amy. The caseworker attempted to call Father, but when she called the phone number on the application, she was told she had the wrong number.

The trial court granted the Department's emergency request for temporary conservatorship and, after a hearing on April 18, 2022, the court made the findings necessary to maintain Amy's placement in the Department's care. In its order, the trial court stated that Father had "made an appearance for all purposes and [] waived the requirement of service of citation."

On May 5, 2022, the Department filed the family service plan it initially created for Father on April 22, 2022.[5] The plan identified several strengths reported by Father, including that he had a large family support system, worked for a roofing company, paid rent, and maintained positive relationships with his roommates. He also denied having a history of intimate partner violence or drug use and stated that he only drank alcohol on rare occasions. Father reported he had been living with coworkers in a home in Austin owned by his employer for six years. Father's family service plan reflects the Department was concerned that Father's roommates were day laborers with whom he worked, that Father had provided no stable support for

---

[5] Father's family service plan contains inconsistent information because although it states several times that the Department had been unable to locate Father, the plan also reflects that the Department had spoken to Father.

Amy, and that Father may have been leaving Amy in unsafe environments leading to her sexual and emotional injuries.

According to Father's family service plan, Father told the Department that Amy "recently lived with him for a few months before returning [Amy] to the mother" in Houston, and he denied "questioning why the child's change in residence was necessary nor having any concern for the child's living environment and this child has recently tested positive for Herpes." Father also informed the Department he had no experience being a child's primary caregiver because he had been deported after his two adult children were born. One of the Department's goals for Father was for him to obtain, "with the support of his family, friends, and the Department, . . . protective parenting skills" and for him to "exhibit these skills in the care of [Amy]." Father's family service plan also required him to maintain safe and stable housing free of environmental hazards for six months, provide the Department with a copy of his signed lease, provide proof of income, complete a parenting class, maintain communication with the Department, and, if he tested positive for drugs, complete a drug and alcohol evaluation and follow through with all recommendations. Although Father was ordered to participate in a drug test on or before May 6, 2022, Father was unable to complete the test because he could not provide a form of identification to the testing center.

On May 17, 2022, the trial court held a status hearing, which Father attended. The trial court reviewed and approved the terms of Father's family service plan, ordered Father to comply with the plan, and prohibited Father from visiting with Amy "pending further order of the Court." The trial court also confirmed that Father had reviewed and understood his family service plan and that he had been advised that his parental rights could be restricted or terminated unless he proved he was able to provide Amy with a safe environment.

On May 18, 2022, Father submitted to a drug test which reflected that a sample of his hair tested positive for methamphetamine, cocaine, and marijuana. His urine sample also tested positive for cocaine and marijuana.

**Trial**

The trial court held a bench trial on September 1, 2023, February 7, 2024, and June 14, 2024. Father, Mother, Department case worker Tanecia Ash, and Javier Gonzalez with Child Advocates testified.

**A.     Father**

Father, who does not speak English, testified through an interpreter. His testimony (which in total occurred over three separate days during trial) was inconsistent on several points. He testified that when Amy was born, Amy and Mother lived with him in Austin, Texas, but when Amy was about two years old, Mother and Amy moved to Houston, Texas. According to Father, he had Mother's

8

phone number, Mother called him every two days after she moved to Houston, and he sent Mother about $300-$400 every eight days through Western Union. Although Father stated he did not visit Amy in Houston because he did not know where Amy lived, he also acknowledged that to send money through Western Union you "have to send it to a specific location." Father testified he had no family or friends living in Houston, and he did not know if Amy was living with Mother. He testified he did not know if Mother or someone else was caring for Amy in Houston.

Father testified the Department became involved with the family in March 2022. He could not recall the last time he had seen Amy prior to March 2022. Father learned of the Department's involvement from his sister-in-law, who told him the Department was looking for him because someone had abused Amy. Father recalled speaking to a Department caseworker over the phone. He told the caseworker he was concerned because he did not have "any communication with [Mother]," who "never called" him after Amy was removed from her care. When asked if he "recall[ed] telling CPS [he] was concerned because [he] knew [M]other used illegal substances or drugs," he responded that when Mother was with him, "she never used any of that." Asked if he recalled "telling CPS that [he was] concerned because the [M]other used drugs," he responded, "Well, yes, because she had my daughter with her."

When asked if he had told the caseworker he used drugs, Father testified that he used drugs once, "but not since then." According to Father, the Department sent him for drug testing several times and he appeared for drug testing each time. Father also presented at a clinic to be tested for STDs as requested by the Department, but he could not recall the date he was tested. When asked if he had tested positive for drugs, Father testified that "about two or three times, I had smoked [marijuana] before, yes, but just then." Although Father initially testified that marijuana was the only drug he had used, he later testified that he used cocaine on one occasion. Father also tested positive for methamphetamine in May 2022. Father testified he occasionally drank a beer on the weekend or when he got off work. When asked if he had used cocaine in 2023, Father testified he could not remember. He also testified that he told the Department he used cocaine because the situation with Amy was very stressful. Father testified that he used marijuana three weeks before trial.

When asked about his family service plan, Father testified he was employed, and he had taken parenting classes. Although the Department had asked him to attend an intensive outpatient drug program, Father testified he did not attend because the service provider never answered his phone calls. Father told the Department that he had called the service provider, and that although someone had told him they would call him back, no one ever did. Father, who lived in a one-

bedroom apartment, denied telling the caseworker that he was not available when the caseworker attempted to visit his home to make the call with him.

During examination by his counsel, Father testified that he had been living in Austin for six years. Mother and Amy lived with him in Austin when Amy was first born, but they moved to Houston when Amy was about a year old. According to Father, Amy and Mother would visit him in Austin and he would visit them in "the same house there" in Houston every month. Noting that Father had earlier testified he had not seen Amy since her move to Houston because he did not know where Amy lived, the trial judge interjected and asked for clarification.

> Father's Counsel: Okay. So, are you telling the judge that after the mother and the baby moved out of your house in Austin, you came to Houston to see them?
>
> Father: No, because I never knew where she lived.
>
> Father's Counsel: Okay. Then -- did you -- so, you're -- okay. So, you didn't see them once they left?
>
> Father: Yes, I would go and visit them and they would bring -- she would bring my daughter sometimes.
>
> Mother's Counsel: Your, Honor can I just get the translation. He said (speaking Spanish.)
>
> Father's Counsel: Okay. So, they would visit you in Austin?
>
> Father: Yes, she would bring me the daughter sometimes.

11

When asked if he remembered the last time Mother brought Amy to visit him in Austin before the Department became involved with the family, Father testified that it was "about two months before."

Father testified that he lived in a one-bedroom apartment in Austin with his brother-in-law and he worked as a roofer from Monday to Saturday. He planned for Amy to live with him and his brother-in-law when Amy was returned to his care. Father testified that the apartment was three blocks from an elementary school, and he would make sure Amy attended school. Father testified that the Department had not visited his apartment because he had "just rented [the apartment] last week."

Father testified that he had completed parenting classes. He admitted that although the Department had asked him to attend therapy, he had not done so. He expressed concern about seeking treatment at a drug rehabilitation center because he works Monday through Saturday, and he can only take one or two days off work, and he needs a job to support himself. He testified he had otherwise gone "to every appointment that CPS told [him] to go." He also testified that two Department workers had each visited his home in Austin once.

Father, who only speaks Spanish, testified that he cannot read or write, but his brother-in-law helps him when Father receives text messages. According to Father, his phone number has been the same for two or three years and the Department has been able to contact him using that phone number. Father testified that he was not

in contact with Mother and if the trial court ordered him not to see Mother, he would be able to protect Amy from seeing Mother. Before passing the witness, Father's counsel reserved the right to call Father during his case-in-chief.

On cross-examination by Mother's counsel, Father testified that Mother and Amy stayed at his home when they visited him in Austin, and they would take Amy to the park and go out to eat. According to Father, Amy appeared "very happy and very healthy," and well fed. When asked if he was worried about Amy's safety when Mother and Amy visited him in Austin, Father testified that he was "worried because [Mother] would only come and she would be there for—she would come for, like, one or two days and then she would leave again." Father testified that despite his concerns for his daughter, he did not keep Amy with him in Austin because Mother did not want to leave Amy with him.

When asked about Mother's drug use, Father testified he had "never seen [Mother] use drugs," but he also testified that Mother's aunt told him Mother used drugs. Father testified that he used marijuana "once or twice a week" because he was "just trying to relax because of this thing of not having my daughter." Father testified that his marijuana use did not interfere with his ability to work or pay his bills. When asked if his marijuana use would prevent him from caring for Amy, Father testified he would "quit using" drugs if Amy lived with him.

13

When asked if he understood the Department's concerns "as to why [Amy was] in the care of the Department," Father testified, "No, like, what?" When asked why Amy was in the Department's care, Father testified, "Well, I'm going to have to say that I don't understand."

On cross-examination by Amy's attorney ad litem, Father testified that Amy and Mother lived with him in Austin after Amy was born, and they lived with him until Amy was about two years old and started to walk. After, Amy lived with Mother in Houston until she was taken into the Department's care at the age of five. Father testified that he never cared for Amy after she moved to Houston with Mother.

Father testified that he had a conversation with Child Advocates in June 2022. During the conversation, he told Child Advocates that shortly before Amy was removed from Mother's care, he traveled to North Carolina to pick up Amy from her maternal grandparents' home where Mother had "left her." Asked how he learned his daughter was in North Carolina, Father testified that Amy's maternal grandfather called him. He told Father that Mother had left Amy with him and Amy's maternal grandmother in North Carolina and that Amy was asking for Mother and Father. After speaking with Amy's grandfather, Father called Mother, who was in Houston. Mother told him to pick up Amy in North Carolina because she was working, "according to her." The Department tried to inquire about the timing of this incident, asking Father whether he picked up Amy in North Carolina near the time of her

14

birthday in February 2022. Father testified he could not remember when Amy's birthday was, but that he had Amy "like a week before her birthday." Asked if her birthday was February 8, Father testified he could not remember, but he recalled that Amy stayed with him for about a month after he picked her up from her grandparents' house in North Carolina. After Father picked up Amy from her grandparents' home, he drove back with Amy to his home in Austin. Amy stayed with Father in Austin for about a month until Mother took her back to Houston. Shortly after, Amy came into the Department's care. And after that, Father did not see Amy or speak to Mother.

Father testified that Mother's aunt told him Mother "was using drugs" and that he told CPS that "that was a concern" for him. He testified that, when Mother brought Amy back to Houston, he was concerned about Mother's ability to care for Amy. He also testified he was concerned about Amy's care after Mother picked her up in Austin because Mother "had left her already in North Carolina." Father was worried that if "Mother took [Amy] and brought her to Houston," she "might leave her with someone else." Father did not know if Mother had left Amy in someone else's care when they returned to Houston because he "couldn't find out" and he did not see or speak to Mother after she picked up Amy in Austin. Father also did not know that Amy was with Jim, not Mother, when she came into the Department's care.

15

Father testified that a caseworker told him Amy had been taken into the Department's care because Amy had been sexually abused. Father acknowledged he was right "to be concerned when [M]other took [Amy] to Houston," but when asked if he did "anything to try to keep [Amy] safe," he responded, "Like what?" He stated he did not have communication with any of Mother's relatives, but he acknowledged he had Mother's number and would call Mother if he needed to make sure Amy was safe. Father testified he did not know what to do because Mother did not want to leave Amy with him, and he "couldn't do anything" when Mother left with Amy.

Before recessing trial for the day, the court ordered Father to submit to drug testing and asked Child Advocates for an update on Amy and John. The advocate reported that Amy and John had been recently placed in a foster home that was intended to be a long-term placement, and the foster parents wished to adopt both children. She stated Amy had adjusted well to the home. She was attending school, seemed happy, and had already formed a bond with the foster parents because she had pre-placement visits with them. The advocate said, "We are very confident about this placement and hoping it continues to work out." She told the trial court that the foster parents were able to meet Amy's and John's educational needs. The children's attorney ad litem agreed with the advocate's assessment and told the trial court that the children appeared to be happy in the current placement.

16

Father's hair tested positive for cocaine and marijuana and his urine test, taken two days later, on September 15, 2023, tested positive for marijuana.

Amy's attorney ad litem resumed her cross examination of Father when trial resumed five months later, on February 7, 2024. Recalling Father's prior testimony that he had used cocaine and marijuana, the ad litem asked Father how he had obtained the drugs. Father testified that his friends had offered the drugs to him "at a party sometime." When asked if he understood that being around drug users could be unsafe for Amy, Father testified he would not do it again if Amy was in his care. He acknowledged that he had not received "any kind of drug treatment for the drug use." Father stated he never used drugs in front of Amy, and he would refrain from using drugs in the future.

When asked to explain how Amy had returned to live with Mother in Houston after Father picked up Amy in North Carolina, Father testified that Mother traveled to Austin to pick Amy up. Father denied knowing that "[M]other had previously used drugs," and he denied earlier testifying that he knew "Mother was using drugs." Father testified that had he known Mother used drugs, he would not have allowed Amy to leave with Mother to Houston.

On examination by the Department, Father testified that he had made no attempts to obtain drug treatment during the trial's five-month recess. Father testified that the Department caseworker in Austin sent him for drug testing the week

17

before trial resumed, but he did not know the test results. When asked if he had given the Department certificates of completion for any of the services he had completed, Father testified he could not recall.

On examination by his counsel, Father testified that he had cooperated with the Department during their investigation and "whatever they have asked me to do, I have gone to do the services." With respect to his housing, Father testified he had been living alone in a one-bedroom apartment for three months and the Department had visited the apartment. Photographs of Father's apartment were admitted into evidence. He also testified that he was tested for STDs and given a copy of his test results. When asked if he knew the results of the test, Father testified he did not know the results because he does not know how to read.

On examination by the Department, Father testified that while the Department had asked him to provide a copy of the lease for his apartment, he had not done so because he had forgotten to pick it up. Father agreed that each time he spoke to the Department, the caseworker either spoke Spanish or had a translator service to assist with communication.

## B.    Mother

Mother testified next. She acknowledged that she was under the influence of crack cocaine at trial, which she admitted to using two days before her testimony. Although she knew she had to complete the services listed on her family service plan

for Amy to be returned to her care, Mother testified she completed only one of the required services—drug testing—and the only drug test she took tested positive for crack cocaine. When asked how she obtained illegal drugs, Mother testified that "[s]ome friends who are in the street give them to me." She testified that it was not safe for Amy and John to be around people who sold her or provided her with drugs.

Mother testified she had sustained a serious head injury during a bar fight at the beginning of this case which impacted her memory and her ability to work. She could not recall Amy's and John's ages or the last time she had seen Amy. Although she knew Amy had contracted a sexually transmitted disease, Mother did not remember that Amy had been taken into the Department's care after Amy tested positive for herpes. Mother also expressed confusion as to why the Department was requesting that her parental rights to Amy be terminated.

While Mother denied expressing concerns to a Department caseworker about Jim, Mother admitted telling the caseworker she had seen Jim having sex with a dog. When asked if she had concerns about Jim's sexual tendencies, Mother testified she was "worried for [her] daughter" Amy. Despite her concerns, Mother admitted she had left Amy and John in Jim's care for days at a time because Jim "told [her] to leave and [she] didn't have any friends or family here." Mother testified that she lived with Jim, who used illegal drugs, even though Jim had posed a danger to Amy

in the past and she had concerns about Amy's and John's safety when they were around Jim.

The court recessed trial after asking Amy's attorney ad litem about Amy and John. The attorney ad litem informed the court that Amy and John were doing well in their foster placement and that Amy's foster parents were having difficulty finding a speech therapist for Amy. The court made orders to facilitate the provision of those services to Amy and it ordered Father to submit to drug testing that day. Father's drug test results, which were admitted into evidence when trial resumed, reflect that Father's hair tested positive for cocaine and marijuana, and his urine tested positive for marijuana.

## C. Tanecia Ash

Tanecia Ash, a Department caseworker, testified when trial resumed on June 14, 2024. Ash testified that Amy was removed from Mother's and Father's care after Amy was taken to the hospital "for a discharge, vaginal discharge," and was diagnosed with genital herpes, type 2 infection, which is a sexually transmitted disease.

Ash testified that the Department prepared a family service plan for Father. According to Ash, the purpose of a family service plan is for a parent "to complete all services to prove that [they] have completed everything, so [they] can show that [they] can provide a safe and stable home for [their] children." Father's family

service plan, which was filed with the court on May 5, 2022, required Father to maintain safe and stable housing free of environmental hazards, provide the Department with a copy of his signed lease, provide the Department with proof of income, complete a parenting class, submit to drug testing and, if he tested positive for any illegal substances, to complete a drug and alcohol evaluation and to follow through with all recommendations.

According to Ash, the Department contacted Father each month to discuss the requirements of his family service plan, including monthly drug testing. She testified the Department provided the necessary referrals for Father to participate in the required services and informed Father what he was required to do. When asked what accommodations the Department had made for Father, who does not read or write, Ash testified that the courtesy caseworker in Austin spoke Spanish, explained the requirements of Father's family service plan to him, and referred him to Spanish-language service providers.

Ash testified that although Father had cooperated with the Department by speaking with the caseworkers and working on some of his family service plan requirements, he did not complete all of the requirements.[6] When asked what portions of his family service plan Father completed, Ash testified that Father submitted to some of the random drug tests, submitted to a paternity test, started

---

[6]    Ash initially testified that Father did not complete any of his plan's requirements.

parenting classes, and he found "someone that can help him with obtaining some information about the seriousness of what happened with his daughter."

Ash testified that Father reported to the Department that he was employed, but she did not know where he worked, and despite having income, Father had provided no clothing, food, or financial support for Amy during the two years she had been in the Department's care. Ash testified that Father had not demonstrated he had a stable place to live with adequate sleeping arrangements for Amy because although he had allowed the Department to visit his home, he had not provided the Department with a copy of his lease, as required by his service plan. While Father had been attending parenting classes, which the Department provided in Spanish, Father had not provided the Department with a certificate of completion or other proof that he completed the required classes. Although the Department asked Father to test for genital herpes, type 2, Father, who claimed he had tested negative for herpes, failed to provide proof he did not have herpes. Ash testified that the Department received a document from Father, and she heard Father testify that he was negative for "STDs," but the document Father provided as proof was unreadable.

With respect to Father's drug use and drug testing requirement, Ash testified that while Father submitted to some random drug tests, he did not do so on a regular basis, and when he participated in drug testing, he repeatedly tested positive for

cocaine and marijuana. He also failed to complete a drug assessment as required by his family service plan. According to Ash, Father tested positive for marijuana and cocaine throughout the pendency of the case, including during trial, and his ongoing drug usage posed a continuing danger to Amy. Ash explained that Amy and John were young children who required "diligent supervision," and an "individual that's using cocaine may not have the ability to adequately supervise children of this age." She testified that the Department would not place a child in a home with a parent who was actively abusing illegal substances.

Ash testified that Amy had been in the Department's care since March 2022, and despite having two years to do so, Father had not demonstrated he was able to provide Amy with the safety and stability she required or otherwise meet her emotional and physical needs. According to Ash, the Department had not been able to verify that Father had a stable place for Amy to live because Father had not provided the Department with a copy of his lease. Father also had not taken any steps to learn about Amy's therapeutic and educational needs, or demonstrated he had the knowledge and skills necessary to meet those needs. Ash testified that it was very concerning that, despite Father's concerns regarding Mother's ability to care for Amy after he picked her up from her grandparents' home in North Carolina, Father still allowed Mother to take Amy back to Houston. On cross-examination,

23

Ash testified she did not know if Father knew Amy would be in danger when he allowed Amy to leave with Mother to Houston.

Ash testified she had not observed Father and Amy together because the court had entered an order at the beginning of the case prohibiting Father from visiting with Amy. She testified that if Father had tested negative for drugs while the case had been pending, the Department would have asked the trial court to lift the order to allow Father to visit with Amy.

With respect to Amy's foster parents, Ash testified that Amy and John began to "thrive" after they were placed with their foster parents in December 2022, and the children were "doing great." Ash testified that Amy, who was seven years old when Ash testified on February 7, 2024, struggled in school but was "doing a lot better than she was when she . . . first came into care," and was able to say her full name. Amy participated in individual and speech therapy, which her foster parents ensured she received, and she was progressing "very well." Ash testified that Amy might be autistic, and her foster parents had been proactive in getting her on a waiting list to be evaluated. Although Amy shared a bedroom with her four-year-old brother John, their foster parents are planning to move Amy into her own bedroom in a few months.

Ash testified that Amy's foster parents want to adopt her and John. According to Ash, Amy and John were bonded with their foster parents whom they referred to

as "Mom" and "Dad." Ash testified that Amy never mentioned Mother or Father. According to Ash, Amy's foster parents have provided her with a safe and stable placement environment, and it was in Amy's best interest to remain in their home. The Department had no concerns about Amy's safety or her emotional or physical development while she lived with her foster parents and the foster parents had been able to provide appropriate protection for Amy and John. Ash was concerned that if removed from her foster parents' home, Amy would regress because she might not be in a stable home where she would "receive the same kind of love and care" and services she needs to thrive.

In addition to Ash's testimony, the trial court also admitted permanency reports filed by Department on August 31, 2022, March 17, 2023, and September 7, 2023, and the family service plan the Department prepared for Amy.

### 1. Child's Plan of Service

The "Child's Plan of Service" the Department prepared for Amy, dated August 23, 2023, states that Father had not completed his court-required services and there were no known appropriate family members for adoption. Father, who did not have a criminal history or history with the Department, wanted Amy to "remain connected to her culture and language" and continue to speak Spanish.

Amy's service plan stated that Amy "enjoys having conversations with other people and likes to talk about" Father. Although she struggled in preschool and did

not know the alphabet, Amy was "developmentally on target for her age group." The Department instructed Amy's foster parents to "request an [individual education plan] once school start[ed] to evaluate her educational needs." The plan described Amy as a "very bright child" who "catches on quickly" and "shows an interest in school and learning." The Department's education goal for Amy was to learn to count, write her name, and attend a bilingual program beginning in kindergarten. Amy was waitlisted for speech therapy and a therapist had also requested that she receive play therapy. The service plan stated that Amy needed to "remain connected to her culture of origin" and her foster parents will meet her needs by allowing her to interact with those sharing Amy's cultural background and help her "polish her Spanish" and learn English. According to the plan, Amy "is in a home of her cultural and social norms." Amy will also participate in multicultural activities and events in the community while living with her foster parents.

With respect to an appropriate placement for Amy, the Department stated that Amy "will need to be in a patient and caring household" where she will be "protected, as well as given the opportunity to explore and grow." Amy should also be "placed with her younger brother [John] to maintain their connection and bond." According to the Department, Amy would "benefit from placement in an environment that will provide her with the psychological services and behavioral interventions she needs" and provides "structure and clear rules and expectations

26

that are enforced consistently." The Department stated that Amy's foster parents were willing to provide her "appropriate supervision . . . according to her age and developmental level" and address her needs and issues.

## 2. Permanency Reports

Permanency reports filed by the Department on August 31, 2022, March 17, 2023, and September 7, 2023 were admitted into evidence during trial.

The Department's August 2022 report states that the Department provided all service authorizations for Father to participate in the services required by his family family service plan, but "there [had] been no progress with the parents for family reunification to be achieved." According to the report, Father had not provided proof of housing or employment, participated in parenting classes, maintained contact with the Department, or completed a drug and alcohol assessment. The report states that Father was not asked to submit to random drug testing in April 2022. But on May 18, 2022, Father tested positive for cocaine, methamphetamine, and marijuana.

The Department's March 2023 report states the Department was not able to find suitable family members with whom Amy and her brother John could be placed. Although Father had enrolled in parenting classes and had been in communication with the Department, he had not participated in a drug or alcohol assessment despite being referred twice for that service by the Department and "he continue[d] to be positive for illegal substances…" The report reflects that in addition to his positive

27

drug test on May 18, 2022, Father's September 21, 2022 drug test was positive for cocaine and marijuana, and his October 12, 2022 and November 17, 2022 tests were positive for marijuana. After testing positive for cocaine on January 20, 2023, Father claimed that "he was under a lot of stress which resulted in him indulging in cocaine."

The Department's September 2023 permanency report reflects that Father had moved out of his prior residence and was residing with "a male whom he works for." According to the report, Father was taking parenting classes and maintaining communication with the Department, but he had not been cooperating with the Department's requests for random drug screenings and he did not seem to "understand the seriousness of the sexual abuse that occurred to his daughter."

The reports reflect that Amy and John were placed with their current foster family in December 2022. According to the reports, Amy is a sweet, social girl who enjoys dolls, soccer, and coloring. The reports reflect that although Amy was initially behind in school because she did "not know her colors, letters, or how to count," her academic performance improved while she was in the Department's care. Amy was evaluated by several experts while in the Department's care who recommended that she receive speech and play therapy. They diagnosed Amy with adjustment disorder, child sexual abuse, child neglect, and "upbringing away from parents." Among other recommendations, Amy's mental health evaluators

recommended that she continue to be placed with John in the same foster home, receive "psychological services and behavioral interventions," receive structure and consistent reinforcement of clear rules and expectations, and participate in individual therapy to "process her feeling[s] associated with not being with her family and past traumatic experiences."

The reports reflect that although the Department's initial goal was family reunification, the Department's goal for Amy changed to unrelated adoption, and the Department moved forward with its request to terminate Mother's and Father's parental rights to Amy to improve the chances of locating an adoptive foster home for Amy.

## D.    Javier Gonzalez

Javier Gonzalez with Child Advocates testified last.  He testified that Child Advocates believed it was in Amy's best interest for Father's and Mother's parental rights to be terminated and for Amy to remain in her current placement where she had been receiving the safety and stability she needed.  Gonzalez testified that termination of Father's parental rights was in Amy's best interest because "permanency is important" and Child Advocates did not believe Father had alleviated the concerns that brought Amy into care. Gonzalez testified that Father's ongoing drug use was "a concern for Child Advocates, as well as some other concerns."

29

Gonzalez testified that Amy and John are in a permanent placement with foster parents they are bonded to and consider to be their family. Gonzalez testified that the placement was "very stable," and the foster parents, who want to adopt both children, seemed to be "very knowledgeable of [Amy's and John's] physical and emotional [and] developmental needs." According to Gonzalez, Amy's foster parents were "well versed in what the children need" and the services they require, and they were able to meet the children's needs.

Gonzalez testified that although Father wanted to be reunited with Amy, and he had been involved in the case and attended court proceedings, Father had not demonstrated he was able to meet Amy's emotional and physical needs. According to Gonzalez, Child Advocates was concerned about Father's continued use of illegal drugs because "if parents are under the influence of a substance, a potential substance, they will not be potentially in the right state of mind to be able to care for the children now and in the future." According to Gonzalez, "little ones require a lot of services and attention and needs and parents should be able to provide a sober lifestyle to meet those needs." Gonzalez testified that exposing Amy to an environment in which her parents used illegal drugs was potentially "a dangerous situation." Father's continued drug use also demonstrated that he was unable to provide Amy with "long term stability." Gonzalez requested that the court terminate

30

Mother's and Father's parental rights to Amy to allow her to find the permanency she needed.

In addition to Gonzalez's testimony, the trial court admitted into evidence reports submitted by Child Advocates on September 12, 2022, March 30, 2023, November 30, 2023, and February 2, 2024. The February 2024 report, which is cumulative of the September 2022, March 2023, and November 2023 reports, reflects that Father initially told Child Advocates he lived with "a few roommates" in Austin, Texas and that Amy had lived with him "for a few months." Although Father identified two relatives as possible placements for Amy, neither relative was willing to care for her.[7]

The report also listed the services required of Father and stated that he failed to complete a substance abuse assessment or treatment. With respect to Father's use of illegal drugs, the Child Advocates' report, in combination with Father's drug test results admitted into evidence, reflect that Father appeared for a drug test on May 6, 2022, but he did not take the test because he was unable to provide a form of identification to the testing center. On May 18, 2022, Father submitted to a drug test which showed that a sample of his hair tested positive for methamphetamine, cocaine, and marijuana, and his urine sample tested positive for cocaine and

---

[7] Although the report states that Father had been "given the opportunity to visit the child in Houston but he did not make himself available for any visits," the trial court's May 11, 2022 order prohibited Father from visiting with Amy.

31

marijuana. On September 21, 2022, Father's urine sample tested positive for cocaine and marijuana and on October 12, 2022, Father's urine sample tested positive for marijuana. Father also tested "positive for marijuana" on November 17, 2022, and his January 20, 2023 drug test was positive for cocaine. On September 13, 2023, Father's hair sample tested positive for cocaine and marijuana and on September 15, 2023, Father's urine tested positive for marijuana. Father's drug test results from February 7, 2024 reflect that Father's hair tested positive for cocaine and marijuana and his urine sample tested positive for marijuana.

In its report, Child Advocates recommended that Mother's and Father's parental rights to Amy be terminated, that the Department be granted sole managing conservatorship of Amy, and that Amy remain in her current foster placement.

## E. Father's Case-in-Chief

After the Department rested, Father presented his case-in-chief. Father reiterated that he had been employed as a roofer for several years and he provided the Department with "the information of where [he] worked." Father testified that he earns $200 per day, he can pay his rent, and he has had the same phone number for three years.

Although he testified that it had been "quite a while" since he last used cocaine, he acknowledged that his February 7, 2024 drug test was positive for cocaine and he agreed that the positive test result indicated he was using cocaine at

that time. Father admitted he had not received any drug treatment. Father testified he does not use cocaine when he is working, and he told the Department that his sister would watch Amy while he was at work. He reiterated that he would not have let Amy leave with Mother to Houston had he known Amy was in danger.

Father testified that he never contracted herpes 2 and he had been tested for sexually transmitted diseases. Documentation showing Father had tested negative for sexually transmitted diseases was admitted into evidence. The test results, however, reflect that Father tested negative for HIV, syphilis, chlamydia, and gonorrhea. There is no indication that Father was tested for herpes 2, the sexually transmitted disease Amy contracted prior to her hospitalization.

## F.    Decree of Termination

On July 26, 2024, the trial court signed a decree of termination terminating Father's parental rights to Amy based on the court's findings that Father violated Family Code Sections 161.001(b)(1) (D), (E), (F), (N), and (O), and that termination of Father's rights was in Amy's best interest. The court also appointed the Department as Amy's sole managing conservator.[8] This appeal followed.

---

[8]    The decree of termination also terminated Mother's parental rights, but Mother did not appeal from the decree.

**Termination of Father's Parental Rights to Amy**

In his first five issues, Father argues there is legally and factually insufficient evidence to support the trial court's findings that he committed the predicate acts under Sections 161.001(b)(1)(D), (E), (F), (N), and (O) of the Texas Family Code. The Department concedes that the evidence was insufficient to support the trial court's findings that Father committed the predicate acts under Sections 161.001(b)(1)(F) and (N). Thus, the only predicate acts relevant to our analysis are Sections 161.001(b)(1)(D), (E), and (O).

Sections 161.001(b)(1)(D) and (E) authorize the termination of a parent's rights to a child when the parent has endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E). Under Section 161.001(b)(1)(O), a parent's rights to a child may be terminated if the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* § 161.001(b)(1)(O). Section 161.001(d) provides an affirmative defense to the termination of parental rights under Section 161.001(b)(1)(O). *See id.* § 161.001(d). Under Section 161.001(d), the trial court "may not order termination under [ ]section

[161.001(b)(1)(O)] based on the failure by [a] parent to comply with a specific provision of a court order if a parent proves by a preponderance of [the] evidence that: (1) the parent was unable to comply with [the] specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order [was] not attributable to any fault of the parent." *Id.*; *see In re L.L.-M.C.*, No. 01-21-00233-CV, 2021 WL 4898076, at *4 (Tex. App.—Houston [1st Dist.] Oct. 21, 2021, pet. denied) (mem. op.).

With respect to Sections 161.001(b)(1)(D) and (E), Father argues there is legally and factually insufficient evidence that he "knowingly placed or knowingly allowed" Amy to "remain in conditions or surroundings that endangered her physical or emotional well-being" or that he "engaged in conduct which endangered [her] physical or emotional well-being" because he was unaware of the circumstances in which Amy was living prior to her removal by the Department. Although he used cocaine and marijuana in the past, he argues he never used illegal drugs in Amy's presence, the results of his last drug test indicate he was no longer using cocaine, and he testified he would stop using marijuana if Amy was returned to his care.

Separately, while Father does not dispute that he failed to complete the requirements of his family service plan, Father argues the trial court abused its discretion by finding he violated Section 161.001(b)(1)(O) because he successfully established a defense under Section 161.001(d). He argues he established by a

35

preponderance of the evidence that he made a good faith effort to comply with his family service plan and that his failure to comply with the plan was not due to any fault of his own. *See* TEX. FAM. CODE § 161.001(d).

## A.    Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a] parent[ ] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

A court may terminate the parent-child relationship under Section 161.001 if the Department establishes by clear and convincing evidence that (1) the parent has engaged in one or more of the enumerated predicate acts or omissions under Section 161.001(b), and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). "Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact." *In re M.A.J.*, 612 S.W.3d 398, 406 (Tex. App.—Houston [1st] 2020, pet denied). Only one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding

was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). We assume the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.C.*, 560 S.W.3d at 630–31. We must disregard all evidence that a reasonable factfinder could have disbelieved or found not to be credible. *In re J.F.C.*, 96 S.W.3d at 266. But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard in termination cases, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id*.

When conducting a factual sufficiency review in a termination case, we must consider the entire record. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266. Unlike in a legal sufficiency review, when assessing the factual sufficiency of the evidence we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.C.*, 560 S.W.3d at 630 ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may

38

be considered."). "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Under both legal and factual sufficiency standards, the trial court is the sole arbiter of a witness' credibility and demeanor and the weight of the evidence. *In re J.O.A.*, 283 S.W.3d at 346; *see In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

## B. Endangerment Findings Under Section 161.001(b)(1)(D) and (E)

In his first and second issues, Father argues there is legally and factually insufficient evidence supporting the trial court's finding under Section 161.001(b)(1)(D) that he endangered Amy by knowingly placing or knowingly allowing Amy to remain in conditions or surroundings which endangered her physical or emotional well-being, or under Section 161.001(b)(1)(E) that he endangered Amy by engaging in conduct or knowingly placing Amy with persons who engaged in conduct which endangered Amy's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E).

### 1. Applicable Law

Sections 161.001(b)(1)(D) and (E) authorize the termination of a parent's rights to their child when the parent has endangered the child's physical or emotional well-being. The term "endanger," as used in Section 161.001(b)(1)(D) and (E), encompasses a broad "array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct which subjects child to life of uncertainty and instability endangers child's physical and emotional well-being). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The danger to the child may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"). A parent's use of illegal drugs constitutes endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family &*

*Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d at 345.

Under Section 161.001(b)(1)(D), a parent's rights may be terminated if clear and convincing evidence establishes the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D). This subsection concerns the child's living environment, rather than the parent's conduct, although parental conduct may produce an endangering environment. *See Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re A.J.A.*, No. 01-21-00299-CV, 2021 WL 5702183, at *7 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. denied) (mem. op.). Thus, when seeking termination under Subsection (D), the Department must establish that the child's living conditions "pose a real threat of injury or harm to the child." *In re N.R.*, 101 S.W.3d 771, 776 (Tex. App.—Texarkana 2003, no pet.). The child's environment refers to the acceptability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d at 360.

A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "A parent does not need to know for certain that the child is in an endangering

environment—awareness of a potential for danger is sufficient." *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.) (citing *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)); *see also In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). A parent's rights may be terminated under Subsection D based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.).

Under Section 161.001(b)(1)(E), a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Unlike Subsection (D), termination under Subsection (E) focuses on the parent's conduct and requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also Jordan*, 325 S.W.3d at 723. Thus, the relevant inquiry under Section 161.001(b)(1)(E) is whether there is evidence the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *Jordan*, 325 S.W.3d at 723.

## 2. Analysis – Section 161.001(b)(1)(D).

Father argues there is legally and factually insufficient evidence supporting the trial court's finding that he knowingly placed or knowingly allowed Amy to remain in conditions or surroundings which endangered her physical or emotional well-being because the evidence demonstrates that he did not know that Amy was in danger prior to coming into the Department's care in March 2022. TEX. FAM. CODE § 161.001(b)(1)(D). Relying on his testimony, Father argues he was not aware of the endangering environment in which Amy was living with Mother and Jim in Houston because, although Mother's aunt told him Mother used drugs, Father had never seen Mother use drugs, and had he known Mother was using illegal drugs, he would not have allowed Amy to live with her.

Father also testified that he did not know where Amy and Mother lived or if anyone other than Mother had been caring for Amy in Houston. He also suggests he did not know that Mother and Amy had been living with Jim, an illegal drug user who Mother believed posed a danger to Amy after having observed Jim engaging in sexually deviant behavior. Father argues that Jim is most likely the person who sexually assaulted Amy and infected her with herpes. According to Father, Ash, Amy's caseworker, is the only other witness to testify regarding Father's knowledge of the dangers Mother and Jim posed to Amy, and Ash testified that she did not know if Father knew that Amy was in danger when Amy left with Mother to Houston.

43

The Department responds there is legally and factually sufficient evidence supporting the trial court's finding that Father knowingly placed or knowingly allowed Amy to remain in conditions or surroundings which endangered her physical or emotional well-being because Father knew that Mother used illegal drugs and he failed to take any action to protect Amy or remove her from Mother's custody. According to the Department, there is also ample evidence that Mother endangered Amy by, among other things, using crack cocaine, subjecting Amy to considerable instability, and neglecting Amy's needs, as demonstrated by Amy's developmental delays and Mother's leaving Amy with Jim for extended periods of time even though Mother had observed Jim engaging in sexually deviant behavior and believed he posed a danger to Amy. The Department argues that the trial court reasonably could "have inferred that Father knew of mother's instability and that she posed a danger" to Amy because Father testified that he had Mother's phone number, spoke to Mother frequently, sent money to Mother, and visited with Amy once a month either at her home in Houston or his home in Austin. The Department last argues that given Father's "shifting testimony," the trial court reasonably could have concluded that Father "knew about the considerable instability, neglect, and trauma suffered" by Amy while in Mother's care.

The record reflects that Amy was living with Mother, Jim, and John when she came into the Department's care in March 2022, and that Mother had a serious drug

44

problem and an unstable lifestyle. According to the removal affidavit which was attached to the Department's petition and admitted into evidence, the Department learned that Mother had a "crack addiction," would "disappear[] for periods of time to use drugs," and would take Amy and John with her "when using drugs." Jim told the Department that Mother "uses crack," that she spends time with drug users, that he had come home several times to find a random man in his home along with Amy and John, and that Mother "hangs with drug users around the Bayou." When the Department was unable to locate Mother, Jim told the Department worker she might be able to find Mother "sleeping under a bridge." Additionally, a neighbor told the Department he had seen Mother using drugs "by a canteen around Braeswood and Gessner"—in other words, in the open.

Mother, who testified at trial while under the influence of crack cocaine, stated that "[s]ome friends who are in the street" provide her with illegal drugs and she acknowledged that it was not safe for Amy and John to be around those individuals. She also testified that she had seen Jim having sex with a dog and she worried about Amy being around Jim because of Jim's sexual proclivities. Despite her concerns, Mother nevertheless left Amy and John in Jim's care for days at a time. Mother also testified that she was still living with Jim, who used illegal drugs, even though she had concerns about Amy's and John's safety when they were around Jim.

In January 2022, approximately two months before Amy was taken into the Department's custody, Amy's maternal grandfather called Father to tell him that Amy was with him and Amy's maternal grandmother in North Carolina. He told Father that Mother "had left" Amy there and that Amy was asking for Mother and Father.[9] Father picked up Amy in North Carolina around the first week of February 2022, and Amy stayed with Father in Austin for about a month before Mother took her back to Houston. Father did not see Amy or speak to Mother after they returned to Houston. Father testified that he was concerned about Amy's care after Mother picked her up in Austin because Mother "had left her already in North Carolina" and he was worried that if "Mother took [Amy] and brought her to Houston," she "might leave her with someone else." He testified he was concerned about Mother's ability to care for Amy. Father did not know if Mother had left Amy in someone else's care when they returned to Houston because he "couldn't find out" and he did not see or speak to Mother after she picked up Amy in Austin. He also did not know that Amy was with Jim, and not Mother, when she came into the Department's care.

Father testified that a caseworker told him Amy had been taken into the Department's care because she had been sexually abused. Father acknowledged he

---

[9] It is unclear from the record how long Amy had been with her maternal grandparents or why Mother left Amy there.

was right "to be concerned when [M]other took [Amy] to Houston," but when asked if he did "anything to try to keep [Amy] safe," he responded, "Like what?" He stated he did not have communication with any of Mother's relatives, but he acknowledged he had Mother's number and that he would call [Mother] if he needed to make sure Amy was safe. Father testified he did not know what to do because Mother did not want to leave Amy with him, and he "couldn't do anything" when Mother left with Amy.

Father testified that Amy and Mother first lived with him in Austin, but they moved to Houston when Amy was about two years old. Although Father testified that he did not visit Amy in Houston because he did not know where she lived, and he did not know if Amy was living with Mother or if someone else was caring for his daughter, he also testified that he remained in regular contact with Mother and Mother and Amy "would come visit me and I would go and visit them about every month." He testified that he had Mother's phone number, that Mother called him every two days after she moved to Houston, and that he sent Mother about $300-$400 every eight days through Western Union. Although Father stated he did not visit Amy in Houston because he did not know where Amy lived, he also acknowledged that to send money through Western Union you "have to send it to a specific location."

47

Father gave conflicting testimony regarding his knowledge of Mother's drug use. Although Father suggests he did not know for certain that Mother used illegal drugs, he testified that Mother's aunt told him Mother "was using drugs" and that he told a Department caseworker that "that was a concern for him" because Mother "had [Amy] with her." When asked if he knew Mother "had previously used drugs" when she picked up Amy at his home in Austin after he and Amy returned from North Carolina, Father testified he did not know that Mother used drugs, and he denied having previously testified to the contrary. Father testified he would not have allowed Amy to leave with Mother to go to Houston had he known that Mother used drugs.

There was also evidence that when Amy came into the Department's care, she had significant developmental delays. According to her medical records, Amy appeared to be developmentally delayed and was "mostly nonverbal." She was unable to state her name, state her birthday, count to ten, or recite the alphabet. Amy was later diagnosed with developmental and speech delays, adjustment disorder, child sexual abuse, and child neglect.

The record thus reflects that about two months before Amy came into the Department's care, Mother had left Amy with her maternal grandparents in North Carolina, Amy's grandparents felt the need to call Father because Amy was asking about Mother and Father, and when Father took Amy with him to Austin after

picking her up in North Carolina, Mother left Amy with Father for about a month.[10] The record reflects that Father was concerned about Amy's care when Mother picked her up in Austin because Mother had already left Amy in North Carolina, and he was worried about Mother's ability to care for Amy and that Mother might leave Amy with someone else in Houston.

The record also reflects that, at some point, Mother's aunt told Father that Mother "was using drugs."[11] When asked if he recalled telling CPS that he was concerned because Mother used drugs, he responded, "Well, yes, because she had my daughter with her." The record further reflects that when Mother picked up Amy from Father's home in Austin about one month before Amy came into the Department's care, Father was worried Mother would leave Amy in someone else's care when they returned to Houston, particularly given that Mother recently had left Amy in North Carolina. Despite being concerned about Mother's illegal drug use which, around the time Mother retrieved Amy from Austin, was described as a "crack addiction" and something Mother was not trying to conceal given her open use of drugs and frequent association with drug users, and the possibility that Mother might leave Amy in someone else's care when they returned to Houston, Father did

---

[10]     There is nothing in the record reflecting Mother made any effort, prior to picking up Amy from Austin a month later, to contact Amy or inquire about her well-being while she was with Father.

[11]     The record does not reflect when Mother's aunt shared this information with Father.

49

nothing to prevent Mother from taking Amy with her to Houston. Father testified that he "couldn't do anything" because Mother did not want to leave Amy with him, and he did not know if Mother left Amy in someone else's care after they returned to Houston because he "couldn't find out." Father did not explain what, if anything, he did to "find out" where Amy was staying or if she was in a safe environment. And while he testified that after Amy left, he heard nothing from Mother or Amy until he learned later from his sister-in-law that Amy was in the Department's care because she had been abused, he also acknowledged that he had Mother's number.

This evidence is sufficient to support a finding of endangerment under Subsection (D). *See In re B.M.S.*, 581 S.W.3d at 917 ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."); *In re M.C.*, 352 S.W.3d 563, 568 (Tex. App.—Dallas 2001, no pet.) (holding father's knowledge of mother's drug use and failure to take any action to remove children from mother's home was sufficient to support finding under subsection D); *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *13 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support endangering-environment finding under (D) when father was aware of mother's illegal drug use and left children in her care); *In re Z.C.J.L.*, No. 14-13-00115-CV, 2013 WL 3477569, at *13 (Tex. App.—Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.) (same).

Father argues that he did not know Mother was doing drugs because Mother never did drugs when she was with him and had he known Mother was doing drugs, he would not have released Amy to her. But termination under Section 161.001(b)(1)(D) does not require that a parent "know for certain that the child is in an endangering environment." *See In re I.N.D.*, 2020 WL 2441375, at *3. "[A]wareness of a potential for danger is sufficient." *Id.*; *see also In re S.M.L.*, 171 S.W.3d 472, 478 (Tex. App.—Houston [14th] Dist. 2005, no pet.) (same); *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) ("It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk."). Moreover, although Father testified that he did not know Mother used drugs, he also testified that Mother's aunt told him Mother used drugs and that he communicated to a Department worker that he was concerned about Mother's drug use because Amy was with Mother, supporting an inference that Father had some knowledge about Mother's drug use when she still had custody of Amy. It was the trial court's province as the sole factfinder to resolve any conflicts in the testimony, and as the fact finder, the trial court have inferred from Father's statements to the Department that he knew Mother used illegal drugs when Amy was in her care and disbelieved Father's testimony to the contrary. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor); *Jordan*, 325 S.W.3d at 713 (stating "[w]hen there is conflicting

51

evidence [in a parental termination case], it is the province of the trier of fact to resolve such conflicts"); *see In re R.R.A.*, 687 S.W.3d at 279 n.50 (stating courts defer to factfinder's findings with regard to credibility of witnesses and weight to give their testimony, "including reasonable and logical inferences from the evidence").

Even if Father was unaware of the specific circumstances that endangered Amy, such as that Mother left Amy unsupervised with Jim for extended periods of time despite her concerns for Amy's safety when she was around Jim, or that Mother took Amy with her when she was using drugs, the trial court reasonably could have inferred from his conflicting testimony that Father knew that leaving a five-year old girl with a parent who uses illegal drugs and had recently left Amy with her grandparents in North Carolina, taking almost a month before picking her up from Father, which Father testified was something that concerned him, created at least the potential for physical or emotional danger to Amy. *See In re B.M.S.*, 581 S.W.3d at 917 ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."); *In re I.N.D.*, 2020 WL 2441375, at *3 (holding that parent does not need to know for certain that child is in endangering environment and that awareness of potential for danger is sufficient). Although Father testified that he did not visit Amy in Houston, Father testified that he remained in frequent contact with Mother, stating Mother called him every two days

52

after she moved to Houston. He also later testified that Mother would visit him in Austin and that he would visit Mother and Amy in "the same house there" in Houston every month. Given this evidence, which the trial court was at liberty to resolve to the extent there was a conflict, coupled with evidence of Amy's apparent speech and developmental delays and Father's expressed concern that Mother might leave Amy with someone else when she and Amy returned to Houston, the trial court reasonably could have inferred that Father knew about Mother's unstable environment and her inability to care for Amy, and that such inability and instability posed a threat of injury or harm to Amy's physical or emotional well-being.

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Father knowingly placed or knowingly allowed Amy to remain in conditions or surroundings which endangered her physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father knowingly placed or knowingly allowed Amy to remain in conditions or surroundings which endangered her physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266.

We overrule Father's first issue.[12]

## C.  Best Interest

In his sixth issue, Father argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of his parental rights was in Amy's best interest.  *See* TEX. FAM. CODE § 161.001(b)(2).

### 1.  Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct.  *See In re A.V.*, 113 S.W.3d at 361.  There is a strong presumption that the best interest of a child is served by keeping the child with a parent.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."  TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for

---

[12]  Because there was clear and convincing evidence supporting the trial court's findings under Section 161.001(b)(1)(D), it is not necessary for us to decide whether there was also sufficient evidence supporting the trial court's findings that Father committed the predicate acts under Section 161.001(b)(1)(E) and (O).  *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating only one predicate finding under Section 161.001(b)(1) is necessary to support decree of termination when there is also finding that termination is in child's best interest).

permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities;

(2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex.

2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

### 2. Analysis

Father argues that it was not in Amy's best interest to terminate his parental rights because he did not sexually abuse Amy, and he would not have left Amy with Mother had he known Amy would be in danger. According to Father, the "only issue of abuse or neglect against Father was his use of illegal drugs" and his history of drug use does not weigh in favor of the trial court's finding that termination of his rights was in Amy's best interest because he never used illegal substances around Amy, there is no evidence that his drug use negatively affected his ability to function or his ability to care for Amy, he testified that he would not use drugs if Amy was returned to his care, he only used cocaine once at a party, and the amount of cocaine in his hair samples decreased from September 13, 2023 to February 7, 2024, thus supporting his testimony that he only used cocaine once. Father further argues that termination of his parental rights is not in Amy's best interest because he has maintained steady, long-term employment with the same employer for several years, and he would protect Amy from Mother if Amy were returned to his care.

The Department argues that termination of Father's parental rights was in Amy's best interest because Father used illegal drugs throughout the two years Amy was in the Department's care, failed to protect Amy from Mother, who he knew was

using illegal drugs, failed to comply with his service plan, and failed to establish stability or obtain treatment to address his ongoing substance abuse.

Multiple factors support the trial court's finding that termination of Father's parental rights was in Amy's best interest, the first of which is Father's ongoing use of cocaine and marijuana throughout the pendency of the case. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("A continuing pattern of illegal drug use. . . implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest."). The record reflects that during the two years this case was pending, beginning on May 18, 2022, Father tested positive five times for cocaine and seven times for marijuana. On May 18, 2022, two months after Amy was placed in the Department's care, Father's hair sample tested positive for methamphetamine, cocaine, and marijuana, and his urine sample tested positive for cocaine and marijuana. On September 21, 2022, Father's urine sample tested positive for cocaine and marijuana and on October 12, 2022, Father's urine sample tested positive for marijuana. Father also tested positive for marijuana on November 17, 2022, and his January 20, 2023 drug test was positive for cocaine.

Father testified on September 1, 2023, the first day of trial. At the conclusion of the first day of Father's testimony, the trial court ordered Father to submit to drug testing and recessed the trial. On September 13, 2023, Father's hair sample tested

positive for cocaine and marijuana, and on September 15, 2023, Father's urine tested positive for marijuana. The trial reconvened on February 7, 2024, and after hearing testimony from Father and Mother, the trial court ordered Father to submit to drug testing and recessed the trial until June 14, 2024. Father's drug test results from February 7, 2024 reflect that Father's hair sample tested positive for cocaine and marijuana, and that his urine sample tested positive for marijuana. Although he testified on June 14, 2024—the last day of trial—that it had been "quite a while" since he last used cocaine, Father acknowledged that his February 7, 2024 drug test tested positive for cocaine and he agreed that the positive test result indicated he was using cocaine when the test was taken. Father testified that he had not received drug rehabilitation treatment.

This evidence establishes a two-year pattern of ongoing illegal drug use during the pendency of the case when Father knew his parental rights to Amy were in jeopardy, and when he knew his family service plan required him to stop using drugs before Amy could be returned to his care. The evidence thus supports the trial court's finding that termination of Father's parental rights was in Amy's best interest. *See In re N.J.H.*, 575 S.W.3d 822, 834–36 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding father's history of drug use and continued drug use during case implicated second, third, fourth, and seventh *Holley* factors—child's emotional and physical needs, emotional and physical danger to child, father's

59

parental abilities, and stability of home—and supported best-interest finding); *In re K.P.*, 498 S.W.3d 157, 174–75 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding mother's continuing drug use, evidenced by repeatedly testing positive for drugs, implicated third, fourth, and eighth *Holley* factors—emotional and physical danger to child, mother's parental abilities, and parental acts or omissions indicating improper parent–child relationship—and supported best-interest finding).

Although there is no evidence Father used illegal drugs around Amy, a parent's use of illegal drugs can constitute endangerment even if it occurs outside of the child's presence. *See In re J.O.A.*, 283 S.W.3d at 345 (stating "endangering conduct is not limited to actions directed towards the child"); *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence.").

Furthermore, Father, who testified that it was not safe for Amy to be around people who used illegal drugs, does not dispute that he continued to use marijuana throughout the entire case. Rather than acknowledging and seeking treatment for his ongoing drug use, Father minimized the extent of his drug use and attempted to justify or excuse his behavior. This evidence also supports the trial court's best interest finding. *See In re A.J.W.*, No. 04-19-00346-CV, 2019 WL 6333468, at *6 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.) ("The court could have

60

rationally concluded that [mother] is unable to protect her children or to provide them a safe and stable environment because she minimizes her drug problem."); *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *7 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.) (stating mother's "choice to minimize her past drug use" was factor of "particular significance" for best interest analysis).

In addition to supporting the trial court's finding under Subsection (D) that Father endangered Amy, the evidence that Father told a Department worker he was concerned about Mother's drug use because Mother "had my daughter with her" and that he was concerned about Mother's inability to care for Amy, especially in light of Mother's recent actions in leaving Amy in North Carolina, and yet took no steps to protect Amy from Mother or remove Amy from Mother's care also supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

Evidence of Father's failure to complete his family service plan also supports the trial court's finding that termination of his parental rights was in Amy's best interest. *See id.* (stating evidence supporting trial court's finding that parent failed to complete family service plan also supported finding of termination of parent's rights in child's best interest). While the record reflects that Father completed or attempted to complete some of the requirements in his family service plan, the evidence also reflects he failed to comply with other requirements such as not

completing a substance abuse assessment, attending intensive outpatient drug treatment, providing the Department with a copy of his lease and proof of income, and submitting to all random drug tests. *See* TEX. FAM. CODE § 263.307(b)(10) (identifying parent's willingness and ability to seek out, accept, and complete counseling services as best interest factor). Father had over two years to satisfy his family service plan's requirements, including receiving a substance abuse assessment and attending intensive outpatient drug treatment, and he failed to do so. *See id.* § 263.307(b)(11) (identifying parent's willingness and ability to effect positive environmental and personal changes within reasonable period of time as best-interest factor); *see also In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, at *11 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) (holding parent's "failure to make use of the rehabilitative services offered by the Department supports the trial court's best-interest finding" when parent had "opportunity to address her drug use and parenting through her family service plan [and] she failed to do so").

The Permanency Reports prepared by the Department stated that Father had "not obtained any individuals that can guide him in the situations that he cannot understand and seems to not understand the seriousness of the sexual abuse that has occurred to his daughter." Amy was diagnosed with developmental and speech delays, and assessments recommended speech and occupational therapy. While in

62

the Department's care, experts also diagnosed Amy with adjustment disorder, child sexual abuse, child neglect, and "upbringing away from parents." There was no evidence that Father would be able to provide the necessary services and therapy Amy requires. Father's inability to appreciate the severity of Amy's abuse and the reasons she had come into the Department's care, as well as the lack of evidence that he would be able to meet her future therapeutic needs, also support the trial court's finding that termination of his parental rights was in Amy's best interest. *See* TEX. FAM. CODE § 263.307(b)(12) (identifying parent's demonstration of "adequate parenting skills, including providing the child with minimally adequate health" and parent's "understanding of the child's needs and capabilities" as best interest factor); *Holley*, 544 S.W.2d at 372 (recognizing present and future physical and emotional needs of child and parental abilities of persons seeking custody as best interest factors).

By all accounts, Amy's foster parents have provided her and John with a loving, safe, stable, nurturing, and drug-free home environment and both children are thriving in their care, thus demonstrating that Amy's foster parents are able to meet her present and future physical and emotional needs. There is also evidence that Amy was well bonded to her foster parents, whom she referred to as Mom and Dad, and who wanted to adopt Amy and John. *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, present and

future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, child's desires, and stability of home or proposed placement as best interest factors); *see also In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."). Amy's young age and developmental delays also support the trial court's finding that termination of Father's rights was in Amy's best interest. *See* TEX. FAM. CODE § 263.307(b)(1) (identifying child's age and physical and mental vulnerabilities as best interest factors).

Father argues that termination of his parental rights is not in Amy's best interest because the evidence indicates that he stopped using cocaine while the case was pending, he would protect Amy from Mother if Amy were returned to his care, and he had maintained steady, long-term employment with the same employer for several years. While evidence that a parent has improved his circumstances weighs against a best interest finding, such improvements, particularly those made on the eve of trial, do not conclusively negate past endangering behavior. *See In re J.O.A.*, 283 S.W.3d at 346 (stating "[w]hile recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not

conclusively negate the probative value" of past behavior). According to Father, the amount of cocaine detected in his hair samples decreased from 6038 pg/mg in September 13, 2023 to 3839 pg/mg in February 7, 2024, which indicates that he had stopped using cocaine, and this evidence supports his testimony that he had only used cocaine once at a party and the last time he used cocaine was "quite a while" before June 14, 2024, the last day of trial. Trial began on September 1, 2023. Even if the trial court found this evidence indicated Father had stopped using cocaine, the trial court nevertheless reasonably could have concluded that the recent improvement in Father's circumstances was of too short a duration to negate Father's two-year pattern of illegal drug use, especially in light of his continued marijuana use. *See In re S.R.*, 452 S.W.3d at 368 (stating "factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination"); *see also Jordan*, 325 S.W.3d at 732 ("Although evidence shows [the mother] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices.").

Although Father testified that he would protect Amy from Mother if Amy were returned to his care, and he traveled to North Carolina to pick up Amy from her maternal grandparents' home and kept her with him in Austin for one month, Father nevertheless failed to protect Amy from Mother by allowing Mother to remove Amy from his home and take Amy with her to Houston despite his

knowledge of Mother's drug use and his concern that Mother would leave Amy in someone else's care. The trial court could infer from Father's failure to protect Amy from Mother that he would not be able to protect Amy in the future if she were returned to his care. *See In re O.N.H.*, 401 S.W.3d at 684 (stating parent's past conduct is probative of his future conduct when evaluating child's best interest); *see In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor); *In re R.R.A.*, 687 S.W.3d at 279 n.50 (stating courts defer to factfinder's findings with regard to credibility of witnesses and weight to give their testimony, "including reasonable and logical inferences from the evidence"). As the sole factfinder, it was in the trial court's province to disbelieve Father's testimony that he would not use drugs if Amy was returned to his care, especially given the fact that the case had been pending for over two years at the last day of trial, and Father had not received drug treatment. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor). Similarly, although Father testified that he had worked as a roofer for the same employer for several years and had safe, stable housing, Father had not provided proof of income or a copy of his lease to the Department as required by his plan to verify compliance. *See id.*

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that

termination of Father's parental rights was in Amy's best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights was in Amy's best interest. *Id.*; *see also In re A.C.*, 560 S.W.3d at 631.

We overrule Father's sixth issue.

### Conclusion

We affirm the decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.